# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| BENJAMIN EDWARD-HENRY BRADLEY, | ) ) ) | |
| Movant, | ) ) | No. 3:19-cv-00643 |
| | ) | Judge Trauger |
| v. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Respondent. | ) ) | |

## MEMORANDUM

Pending before the court is pro se movant Benjamin Edward-Henry Bradley's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence previously imposed by this court. (Doc. No. 1). *See United States v. Bradley*, No. 3:15-cr-00037-2 (M.D. Tenn.) [hereinafter cited as "Crim. Doc. No. ___"]. The government filed a response to the motion, urging that none of Bradley's claims present a valid basis for post-conviction relief. (Doc. No. 8). Bradley filed a reply in response to the government's response. (Doc. No. 9). For the following reasons, the movant's motion will be denied, and this action will be dismissed.

## I.       Background

In a previous criminal case in this court, a wiretap investigation revealed that, no later than November 2012 and until March 11, 2015, Benjamin Bradley was at the top of a distribution chain that sent tens of thousands of diverted opioid pills from the Detroit area to the Nashville area.  On the basis of this conduct, Bradley was indicted, along with numerous co-defendants, in March 2015 on charges of conspiracy to possess with intent to distribute and conspiracy to distribute Schedule II controlled substances (oxycodone and oxymorphone pills) in violation of 21 U.S.C. § 846 (Count One) and money laundering (Count Two) in violation of 18 U.S.C. § 1956(h). (Crim. Doc. No. 1202).

At Bradley's arraignment, attorney James E. Mackler was appointed to represent him. (Crim. Doc. No. 204). Following his appointment, Mr. Mackler filed a motion to suppress the wiretap evidence in this case (Crim. Doc. No. 232), which the court denied (Crim. Doc. Nos. 270 and 271). Mr. Mackler also filed a motion to review the detention order that had been entered in Detroit (Crim. Doc. No. 289), which the court also denied (Crim. Doc. No. 298).

Before pleading guilty, Bradley wrote a letter to the Honorable Todd. J. Campbell asking whether there were "any other sentences available besides imprisonment," such as "[l]ifetime supervised release, 20 years halfway house, [or] 20 years house arrest." (Crim. Doc. No. 397). As part of that letter, he said, "I know all crimes deserve just punishment and I accept full responsibility for my actions. . . . I know this is nobody['s] fault but my own and its [sic] no such thing as doing just a 'little bit of wrong.'" (*Id*. at PageID# 1194). Bradley said that he now realized he had been "chasing the illusion of building this perfect life off [i]ll-gotten gain," and was hoping to make amends to his "victims." (*Id*. at PageID# 1195). He said he was writing "to see why its [sic] taking so long since I admitted my guilt the day I was picked up. I knew in my heart my actions was [sic] wrong and I felt it is righteous for me to accept my responsibility and seek mercy and grace from the Lord." (*Id*.)

Bradley pleaded guilty without a plea agreement to both counts in the indictment in June 2016 before Judge Campbell. (Crim. Doc. No. 478). At the plea hearing, Judge Campbell advised Bradley about the elements of the drug conspiracy charged in Count One:

> For you to be convicted of that, the government would have to prove to a jury, first of all, the elements of a conspiracy. And I need to inform you a conspiracy is a crime of two or more persons to conspire or agree to commit a drug crime even if they never actually achieve their goal. It is a kind of criminal partnership. And the government would have to prove first that two or more persons conspired or agreed to the object of the conspiracy, which in this instance is a violation of Title 21, Section 841, regarding Oxycodone and Oxymorphone.
>
> And secondly, that you knowingly and voluntarily joined the conspiracy.
>
> Now, the object of the conspiracy is Section 841, which is possession of a controlled substance with intent to distribute. And the elements of that offense are

that a defendant knowingly or intentionally possessed the controlled substance set out in the indictment. And here again it is Oxycodone and Oxymorphone.

And second, you intended to distribute those controlled substances.

(Crim. Doc. No. 1027 at PageID# 4015-16).

Bradley raised no questions about these elements and confirmed that he "underst[ood] the nature, the meaning, and the cause of the charge against [him]." (*Id*. at PageID# 4018). He also confirmed that Mr. Mackler had discussed with him both "what the government would have to prove for [him] to be found guilty of Count One and Two," and "any possible defenses that [he] might have." (*Id*.) Bradley confirmed that he was satisfied with Mr. Mackler's representation. (*Id*.) After Judge Campbell further reviewed Bradley's rights with him, Bradley confirmed that he "still want[ed] to plead guilty." (*Id*. at PageID# 4021).

The government then put on a statement of facts through DEA Special Agent Andy Green. (*Id*. at PageID# 4023-26). That statement of facts repeated the charging language from the indictment and added specific details about Bradley's role in the crimes charged. Agent Green noted that Bradley "was frequently intercepted over [several of the Target Telephones] communicating in furtherance of drug trafficking and money laundering." (*Id*. at PageID# 4025). Agent Green added that Bradley "typically collected prescription pills from various sources in the Detroit area," then, "after storing those pills in various locations, delivered them to Donald Buchanan, often by having coconspirators, including Felicia Jones and Eric McEwen drive to meet Buchanan either in the Cincinnati area or the Nashville area." (*Id*.)

Bradley disputed the claim that he had "used McEwen to deliver pills to Buchanan," but otherwise did not dispute the statement of facts. (*Id*. at 4026-27). Bradley then confirmed that he was "offering to plead guilty to Counts One and Two because [he is] in fact guilty as charged in the indictment," and the court accepted his guilty plea after finding it was knowing, intelligent, and voluntary. (*Id*. at PageID# 4027-28).

Nearly eight months passed between Bradley's guilty plea and sentencing hearing. Following the retirement of Judge Campbell, the case was reassigned to the undersigned. In preparation for the sentencing hearing, the U.S. Probation Office prepared a Presentence Investigation Report ("PSR"), which calculated Bradley's base offense level to be 36. (*See* Oct. 20, 2016 PSR, ¶ 22). That offense level was based largely on cooperator statements—which were corroborated by wiretap interceptions—showing that Bradley received hundreds of pills a day for years on end. The PSR did not include an enhancement for possession of a firearm under Section 2D1.1(b)(1) of the United States Sentencing Guidelines ("USSG"). The government objected to the absence of the firearm enhancement in the PSR, arguing that the proof at the sentencing hearing would show that Bradley stored both guns and drugs at his parents' home (Oct. 20, 2016 PSR, Addendum pp. 1-2; Crim. Doc. No. 852 at PageID# 2702-04) and that the weapons were not for any legitimate purpose but, rather, were to protect some of Bradley's drugs and drug proceeds (Crim. Doc. No. 852 at PageID# 2704).

Prior to the sentencing hearing, Mr. Mackler filed a sentencing memorandum on Bradley's behalf, emphasizing that Bradley "has taken full responsibility for his actions," and that he "accepted responsibility from the moment he was arrested." (Crim. Doc. No. 842 at PageID# 2612, 2635).

The sentencing hearing was held on February 1, 2017. At the all-day sentencing hearing, the court heard testimony from six witnesses, including three of Bradley's co-conspirators. (Crim. Doc. No. 919). Pamela O'Neal testified that she was introduced to Bradley through her sister and began working for him by taking patients to the doctor to pick up prescription pills. (*Id*. at PageID# 3234-38). Shortly after O'Neal's long-time boyfriend died, she moved into a house that Bradley owned on Curtis Street in Detroit, where she was allowed to live rent-free in exchange for letting people drop off pills. (*Id*. at PageID# 3238-41). Several different people dropped off pills throughout the day and night, with an average of five-to-ten bags per day arriving at O'Neal's

house, with each bag typically containing 60 or 90 pills. (*Id*. at PageID# 3241-42). At Bradley's direction, O'Neal would collect and organize the pills and deliver them to others, including Felicia Jones. (*Id*. at PageID# 3243-45).

The court also heard recordings of wiretap interceptions corroborating O'Neal's testimony. For example, the court heard a recording of a call from January 30, 2015, in which Felicia Jones told Bradley that she had received 345 Oxymorphone pills and 180 Oxycodone pills that day. (*Id*. at PageID# 3201-02). The court also heard testimony about individual arrests including, for example, (1) Bobby Robertson's arrest on December 5, 2014, when he was found with over 1,000 Oxymorphone pills that he had just received from Bradley (which were in addition to the pills that Bradley had supplied to Buchanan); and (2) Jones's March 12, 2015 arrest, when she was found with 770 Oxymorphone pills that she was about to deliver to Buchanan (while also having 304 more Oxymorphone pills in her house).

After considering the evidence and hearing argument from the parties on the proper calculation of the drug quantity, the court adopted the calculations in the PSR. (*Id*. at PageID# 3368-87). As the court explained, "the quantity reflected in the presentence report is about the best estimate we can get. It's on the very low level, I believe. It's a very conservative estimate." (*Id*. at PageID# 3387). Thus, "the drug quantity reflected in the presentence report will govern the guidelines." (*Id*.)

With regard to the firearm enhancement, the government introduced evidence about the execution of a search warrant at Bradley's parents' home on March 12, 2015. (*Id*. at PageID# 3301-07). The court previously had heard testimony about how Bradley stored pills and cash at his parents' residence and sometimes directed his sister, Bernadette Bradley, to go there to retrieve the pills. (*Id*. at PageID# 3285-93). DEA Task Force Officer Frank DeRiggi testified that, when he and other agents searched the parents' home, they found drugs, cash, and guns. Specifically, agents found $46,300 in cash hidden behind a bar, plus five firearms. (*Id*. at PageID# 3302-05).

Three of the guns (including an old, rusty shotgun) were found in Bradley's father's bedroom closet,[1] while the other two guns—an AK-47 and a sawed-off shotgun with an obliterated serial number—were found, loaded, in the room where the cash was stored. (*Id*.) Officer DeRiggi testified that agents had asked Bradley's father about the guns at the time, and he had responded that the old, rusty shotgun was his, but that the others belonged to his son. (*Id*. at PageID# 3306-07).

When Bradley allocuted at the sentencing hearing, he told the court that he accepted full responsibility for his actions and stated, "I want my family, the community and the Court to see the sincerity in my apology by the way I am taking full responsibility for the bad choices I made." (Crim. Doc. No. 919 at PageID# 3362-68). He acknowledged that he "was already blessed to have a career as a licensed CAT scan technician at Detroit's premier trauma center," where he "made enough money to provide for my family." (*Id*. at PageID# 3363). He admitted, however, that "[i]t was nothing but pure stupidity and greed that caused me to make that uneducated choice to start buying and reselling prescription pills when the proposition was presented to me. My only goal was to make some quick and easy money to buy things that I now realize I really didn't need. . . . I am ashamed and embarrassed but also convicted within my own heart because I was selfish and ungrateful." (*Id*. at PageID# 3363-64). At no point during the hearing did he suggest that he had second thoughts about his guilty plea, or that he had pleaded guilty despite having unknowingly conspired to distribute drugs.

After considering evidence and argument, the court found that the two-level firearm enhancement applied. (*Id*. at PageID# 3398-3404, 3409-10). As the court explained, "[t]he government has proven very strongly that there were four loaded weapons kept at the parents'

---

[1] In his reply to the government's response, the movant states that "[t]he Government cites no part of the record that supports that statement that three of the guns were found in Bradley's father's bedroom closet." (Doc. No. 9 at PageID# 86). However, Officer DeRiggi testified that "two handguns and an old shotgun [were] found in the defendant's father's bedroom closet." (Doc. No. 919 at PageID# 3304-3305).

house where the defendant stored drugs and money. The defendant's own father said that these were the defendant's guns. One of them was an assault rifle." (*Id*. at PageID# 3409). In light of that proof, the burden shifted to Bradley "to prove that it was clearly improbable that these weapons were connected to the drug conspiracy." (*Id*.) Because Bradley had not carried that burden, the court applied the two-level enhancement. (*Id*. at PageID# 3410).

After ruling on all the disputed guideline issues, the court found a total offense level of 45, which is two levels above the top of the sentencing table and therefore became 43 by operation of U.S.S.G. Chapter 5, Part A, app. n.2. (Crim. Doc. No. 919 at PageID# 3410). While that offense level would normally yield an advisory guideline range of life imprisonment, the guideline in this case became 480 months, given the statutory maximums on the two counts of conviction. (*Id*. at PageID# 3414-15). After considering all the § 3553(a) factors, the court imposed a total sentence of 204 months. (*Id*. at PageID# 3427-32).

After imposing Bradley's sentence, the court asked the parties if they had any additional objections. (*Id*. at PageID# 3436). The government noted that the case presented the application of a number of disputed guideline enhancements, but also a very substantial downward variance. In order to avoid the possibility of a remand if Bradley were to successfully appeal some of the disputed enhancements, the government asked if the court would be willing and able to state for the record that it would have imposed the same sentence had the guidelines been lower. (*Id*. at PageID# 3436-37). The court agreed, stating, "I think it's true that—it is true that I've granted a very, very significant variance, and a few points one way or another on these various enhancements would not make any difference in my sentence. I've been very generous and this is a very generous variance and probably would make absolutely no difference in my sentence. I will make that statement." (*Id*.) On behalf of Bradley, Mr. Mackler stated, "We stand by the objections previously and don't have any additional objections." (*Id*. at 3438).

After the sentencing hearings, the parties submitted additional briefing and evidence on the

proper amount of forfeiture. At Mr. Mackler's request, the court appointed additional counsel from the Federal Public Defender's Office to assist with the forfeiture proceedings. (Crim. Doc. No. 905). Roughly two and one-half months later, Mr. Mackler filed a motion to withdraw as counsel, which the court granted. (Crim. Doc. Nos. 973, 974). The court later granted the government's forfeiture motions and then entered a final judgment. (Crim. Doc. Nos. 1004, 1005, 1006).

On direct appeal, Bradley was represented by attorneys from the University of Michigan Appellate Litigation Clinic. (Crim. Doc. No. 1035). Although Bradley's primary argument on appeal related to forfeiture, he also raised two arguments related to his sentence. First, he argued that his sentence was procedurally unreasonable because the court failed to adequately explain its calculation of the applicable drug quantity. Second, he argued that his sentence was substantively unreasonable because it resulted in an unwarranted disparity with the sentence imposed on Donald Buchanan.

The Sixth Circuit rejected both arguments and affirmed Bradley's sentence of imprisonment. *See United States v. Bradley*, 897 F.3d 779, 784-86 (6th Cir. 2018).[2] However, the Sixth Circuit reversed the forfeiture order on the basis that it violated *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), in which the Supreme Court had held that the forfeiture statute, 21 U.S.C. § 853, bars joint and several liability for forfeiture judgments. *Bradley*, 897 F.3d 779, 783–84.

With regard to the sentence's procedural reasonableness, the Sixth Circuit "assess[ed] Bradley's complaint for plain error because he did not object to the adequacy of the court's explanation, even after the court gave him a chance to do so." *Id*. at 785. The Sixth Circuit then reviewed the evidence on drug quantity and found that this court's calculation represented a "conservative estimate" that "[t]he record amply supports." *Id*. With regard to the substantive

---

[2] The Sixth Circuit vacated the forfeiture order and remanded for further proceedings. *Bradley*, 897 F.3d at 782-84, 786. The court has held those further proceedings and issued a new forfeiture order, which is currently the subject of a second appeal. Because the issues raised in that appeal are separate and distinct from the issues raised in this collateral attack on Bradley's sentence of imprisonment, the court can adjudicate this § 2255 case during the pendency of the forfeiture appeal.

reasonableness of the sentence, the Sixth Circuit noted that Bradley's challenge represented an extremely tall order, given that his sentence was "less than half of the recommended range." *Id*. at 786. And, because the record showed, among other things, that Bradley was in fact more culpable than Buchanan, he failed to show that the five-year disparity in their sentences was unwarranted. *Id*.

Bradley filed a petition for a writ of certiorari, which the Supreme Court denied on February 19, 2019. *See Bradley v. United States*, 139 S. Ct. 1221 (2019).

Bradley filed the instant § 2255 motion roughly five months later, on July 29, 2019. (Doc. No. 1). In his § 2255 motion, Bradley attacks his conviction and sentence on five grounds. In Ground One, he alleges that "[t]rial counsel was ineffective for not challenging Count One that charged a drug conspiracy under 21 U.S.C. § 846 that failed to charge the necessary element 'knowingly.'" (Doc. No. 1 at PageID# 4). In Ground Two, he alleges: "At sentencing hearing when Court asked the Bostic question, my counsel was ineffective for not objecting to the inadequacy of the Court[']s expl[a]nation for finding drug amount." (*Id*.) In Ground Three, he alleges that "[c]ounsel was ineffective at sentencing for with[h]olding evidence and not calling witnesses to rebut[] Government Agent's testimony." (*Id*.) In Ground Four, he alleges: "My plea of guilty was not 'knowingly, voluntarily, or intelligently' entered because I was not advised of the co[n]sequences of my plea by the Indictment (Count One), by [the] Court, the Prosecutor, or my counsel." (*Id*. at PageID# 5). And in Ground Five, he alleges that he will be entitled to relief in light of the pending Supreme Court case of *Holguin-Hernandez v. United States*, No. 18-7739, regardless of how it turns out. (*Id*. at PageID# 13-14).[3]

---

[3] The Supreme Court rendered its decision in *Holguin-Hernandez* on February 26, 2020. 589 U.S. ___ (2020).

The government filed a response to the motion, urging that none of Bradley's claims present a valid basis for post-conviction relief. (Doc. No. 8). Bradley filed a reply in response to the government's response. (Doc. No. 9).

## II.    Applicable Law

A prisoner in custody under a sentence of a federal court may move the court to vacate, set aside, or correct his sentence on certain grounds, including that "the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). It is well established that "[t]o prevail under § 2255, a defendant must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or jury's verdict," or "must show a fundamental defect in his sentencing which necessarily results in a complete miscarriage of justice or an egregious error violative of due process." *Wright v. Jones*, 182 F.3d 458, 463 (6th Cir. 1999) (internal quotation marks omitted).

In § 2255 proceedings, it is the petitioner's burden to show his entitlement to relief. *See Potter v. United States*, 887 F.3d 785, 787-88 (6th Cir. 2018). This requires him to "set forth facts"; mere "[c]onclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing." *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961). Indeed, when a "petitioner's claims are stated in the form of conclusions without any allegations of facts in support thereof, as well as being unsupported by proof or reference to such proof," his motion is "legally insufficient to sustain a review." *Short v. United States*, 504 F.2d 63, 65 (6th Cir. 1974) (per curiam); *see also Thomas v. United States*, 849 F.3d 669, 681 (6th Cir. 2017) ("Bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the government to respond to discovery or to require an evidentiary hearing.").

## III.    Analysis

Bradley attacks his conviction and sentence on five grounds. The first three grounds allege that Bradley's attorney, Mr. Mackler, provided constitutionally ineffective representation.

## A.    Ineffective Assistance of Counsel

To prevail on a claim for ineffective assistance of counsel, the movant bears the burden of showing, first, "that his counsel provided deficient performance," and second, that "the deficient performance prejudiced [his] defense." *Sylvester v. United States*, 868 F.3d 503, 509–10 (6th Cir. 2017) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). Trial counsel's performance is deficient where it falls "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [movant] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To establish prejudice, the movant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694. "In making this showing, '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Sylvester*, 868 F.3d at 511 (quoting *Strickland*, 466 U.S. at 693). Instead, the movant "must show that 'counsel's errors were so serious as to deprive the [movant] of a fair trial, a trial whose result is reliable.'" *Id*. (quoting *Strickland*, 466 U.S. at 687). "[A] court deciding an ineffective assistance claim" need not "address both components of the inquiry if the [movant] makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

### 1.    Failure to challenge Count One of the indictment

Bradley first claims that Mr. Mackler was ineffective for failing to move to dismiss Count One of the indictment, which alleged that Bradley and others "did combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to unlawfully, knowingly, and intentionally possess with intent to distribute and to distribute controlled

substances, including Oxycodone and Oxymorphone in violation of Title 21, United States Code, Section 841(a)(1)." (Doc. No. 1 at PageID# 4) (quoting Crim. Doc. No. 3 at PageID# 8-9)). According to Bradley, this charging language failed to give him adequate notice of the charges against him because the language did not specifically allege that he *knowingly* conspired to knowingly distribute drugs. (Doc. No. 1 at PageID# 7-8).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Here, the fact that, although all eighteen defendants were charged in Count One, none of the defense attorneys moved to dismiss Count One on the grounds of inadequate notice suggests that Mr. Mackler's performance did not fall below the prevailing professional norms. *See Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) ("The law does not require counsel to raise every available nonfrivolous defense."). Bradley has not shown that Mr. Mackler performed deficiently by failing to move to dismiss the indictment because it did not allege specifically that he *knowingly* conspired to knowingly distribute drugs.

The second prong of the *Strickland* test requires the movant to show that counsel's deficient performance prejudiced the defense. Thus, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. The movant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Assuming arguendo that Bradley could show deficient performance by Mr. Mackler, he cannot show prejudice. First, even if Mr. Mackler had filed the requested motion to dismiss, the court, in all likelihood, would have denied the motion on the merits because the indictment made clear with what Bradley was being charged. "An indictment must include 'a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *United States v. Schaffer*, 586 F.3d 414, 422 (6th Cir. 2009) (quoting Fed. R. Crim. P. 7(c)(1)). In order to sufficiently charge a defendant, an indictment must "(1) 'set out all of the elements of the charge[d] offense and must give notice to the defendant of the charges he faces[,]' and (2) 'be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts.'" *Id.* (quoting *United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005)). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'" *Hamling v. United States*, 418 U.S. 87, 117 (1974) (quoting *United States v. Carll*, 105 U.S. 611, 612 (1881)). The indictment also must include "such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Id.* at 117–18 (quoting *United States v. Hess*, 124 U.S. 483, 487 (1888)). Even when an "indictment could have been worded with greater precision," it will not be subject to dismissal so long as it "'sufficiently apprises the defendant of what he must be prepared to meet.'" *United States v. Hendrex*, 387 F.2d 931, 932 (6th Cir. 1968) (quoting *United States v. Debrow*, 346 U.S. 374, 376 (1953)). "Courts utilize a common sense construction in determining whether an indictment sufficiently informs a defendant of an offense." *Allen v. United States*, 867 F.2d 969, 971 (6th Cir. 1989).

Bradley was charged with violating 21 U.S.C. §§ 841(a)(1) and 846. Title 21 U.S.C. § 846 defines attempt and conspiracy as follows:

Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

21 U.S.C. § 846. Thus, 21 U.S.C. § 846 states no *mens rea* requirement. Title 21 U.S.C. § 841(a), however, does impose a *mens rea* requirement and defines unlawful acts as follows:

Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally-

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

21 U.S.C. § 841(a)(1).

Count One of the indictment charges that Bradley and his co-conspirators "did combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to unlawfully, knowingly, and intentionally possess with intent to distribute and to distribute controlled substances, including Oxycodone and Oxymorphone." (Crim. Doc. No. 3 at PageID# 8-9). This language tracks the language of 21 U.S.C. § 841(a) and adequately charges the essential elements of a substantive violation under 21 U.S.C. § 841(a). *United States v. McClellan*, 436 Fed. App'x 479, 488 (6th Cir. 2011) (observing that the amended indictment tracked the language of § 924(c), as well as § 1952(a)(2), which is "generally sufficient."). The indictment must be read as a whole and construed in a practical, common sense manner with all of the necessary and reasonable implications flowing from it. *McClellan*, 436 Fed. App'x 479, 487; *United States v. McAuliffe*, 490 F.3d 526, 531 (6th Cir. 2007).

Here, Bradley has not demonstrated that he was surprised or misled regarding the nature of the charges against him. It was made abundantly clear to Bradley through Count One of the indictment, in combination with his colloquy with Judge Campbell during Bradley's plea hearing, with what he was being charged. Although Bradley now claims that he "was blindsided [sic] and sandbagged by Count One's failure to alert him to the government's accusations that he 'knowingly' conspired," (Doc. No. 9 at PageID# 2), during Bradley's plea hearing, Judge

Campbell specifically advised Bradley that, in order for him to be convicted of Count One, the government would need to prove that Bradley "knowingly and voluntarily joined the conspiracy." (Crim. Doc. No. 1027 at PageID# 4015-16). Bradley raised no questions about this element and confirmed that he "underst[ood] the nature, the meaning, and the cause of the charge against [him]." (*Id.* at PageID# 4018). This is not a case, then, where Bradley entered a plea without fair notice of the charges against him.

Since Count One of the indictment charges a conspiracy to violate § 841(a), and because it charges that Bradley unlawfully, knowingly, and intentionally conspired to possess with intent to distribute and to distribute controlled substances, the conspiracy count properly set forth the essential elements of the offense charged. A reasonable person reading Count One of the indictment would readily comprehend and understand it. *See United States v. Greene*, Nos. 4:05-cr-15, 4:10-cv-15, 2013 WL 5488653, at \*20 (E.D. Tenn. Sept. 30, 2013) (finding "there was no violation of [Greene's] right to a fair trial because prior to trial it was made abundantly clear to Greene through Counts One and Two of the second superseding indictment, in combination with the hearing on the motion to suppress the rifle as evidence and the pretrial conferences, that he was being charged with and prosecuted for aiming and brandishing a firearm at the police helicopter in flight" and that "[i]t is disingenuous for Greene to now claim that he lacked fair notice of the nature of the criminal charges and he was deprived of a fair trial."). Thus, Mr. Mackler was not deficient for failing to file a frivolous motion. *See Curtis v. United States*, Nos. 1:06-cv-140, 1:03-cr-73, 2009 WL 124162, at \*\*7-8 (E.D. Tenn. Jan. 14, 2009) (observing that, "contrary to Curtis' contention, the plain language of 21 U.S.C. § 846 imposes no *mens rea* requirement" and finding that an indictment identical in all relevant parts to Bradley's indictment properly set forth the essential elements of the offense charged and that counsel was not deficient for failing to raise a "frivolous objection").

Furthermore, as the respondent notes, in the event a motion to dismiss might have succeeded on the merits, Bradley nevertheless would not have been absolved of responsibility for his drug trafficking. Instead, any dismissal would have been without prejudice and would have resulted in a superseding indictment that included the charging language that Bradley demanded. Thus, even in the best case scenario for Bradley, the likely result would have been a slightly reworded superseding indictment, not a different outcome on the charges. Because Bradley has not demonstrated that Mr. Mackler's performance was deficient or that, even if Mr. Mackler performed deficiently, Bradley was prejudiced, this claim will be dismissed.

### 2. Failure to preserve an objection to the adequacy of the court's explanation

In Ground Two, Bradley contends that Mr. Mackler's performance was constitutionally ineffective for failing to object to the adequacy of the explanation provided by the court when it found that the quantity of drugs yielded a base offense level of 36. (Doc. No. 1 at PageID# 4) ("At sentencing hearing when Court asked the Bostic question, my counsel was ineffective for not objecting to the inadequacy of the Court[']s expl[a]nation for finding drug amount.").

As noted above, the court heard extensive evidence and argument on the proper calculation of drug quantity before ultimately adopting the calculations set out in the PSR. Because Mr. Mackler did not object to the adequacy of the court's explanation, the Sixth Circuit reviewed this claim on direct appeal for plain error. *See Bradley*, 897 F.3d at 784-85; *see also United States v. Bostic*, 371 F.3d 865, 872-73 (6th Cir. 2004).

Mr. Mackler did not perform deficiently by failing to raise an objection to the court's explanation. In sentencing an individual, a district court must properly calculate the advisory guideline range, consider the § 3553(a) factors, rely on facts that are not clearly erroneous, and explain the selected sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). In the context of drug-quantity determinations, the court must rule on disputed calculations, *Fed. R. Crim. P.* 32(i)(3)(B), and explain its factual foundation for doing so. *United States v. Poulsen*, 655 F.3d 492, 512-13

(6th Cir. 2011).When drug quantity is disputed, a court should make a conservative estimate of the total amount by determining the duration of the conspiracy, the frequency of distributions during the conspiracy, and the typical quantities and types of drugs involved in each distribution. *See, e.g., United States v. Woodside*, 642 Fed. App'x 490, 495-97 (6th Cir. 2016).

The court followed this precedent when it adopted as its findings of fact the calculations set out in the PSR. Notably, the PSR calculated a total marijuana equivalency of 33,738.82 kilograms by finding that Bradley distributed 300 pills a day for 621 days, assuming that nearly all of those pills were 30 milligram Oxycodone pills. (Oct. 16, 2016 PSR, ¶¶ 14-16). There was no need for the court to repeat those same calculations aloud to explain how it calculated the applicable drug quantity.

Mr. Mackler may have had valid tactical reasons for not objecting to the adequacy of the court's explanation. A base offense level of 36 was a conservative estimate that gave Bradley the benefit of several assumptions. For example, it assumed that the conspiracy lasted for only 621 days when, in fact, the conspiracy lasted nearly four times as long. (Feb. 2, 2017 PSR ¶¶ 10, 14 (noting that the conspiracy began in 2009)). The PSR also assumed that nearly all of the pills Bradley distributed had been 30 milligram Oxycodone pills when, in fact, he distributed large numbers of Oxymorphone pills, which convert at a higher ratio. Therefore, if Mr. Mackler had insisted that the court explain its findings on duration, quantity, and drug type in greater detail, the court might have determined that Bradley had a higher base offense level of 38.[4] Choosing not to raise an objection under these circumstances would have been a reasonable strategic choice.

Even if Bradley could show that Mr. Mackler's failure to object to the court's explanation was deficient performance, Bradley cannot show prejudice. Had Mr. Mackler raised an objection,

---

[4] The PSR assumed that virtually all of the pills Bradley distributed were Oxycodone (which converts based on the weight of the actual controlled substance) rather than Oxymorphone (which converts based on the weight of the full pill). As the government noted in its sentencing memorandum, if the PSR had used the same quantity but applied a more realistic mix of Oxycodone and Oxymorphone pills, the marijuana equivalency would have far exceeded the quantity triggering a base offense level of 38. (Crim. Doc. No. 852 at PageID# 2700 n.2).

it is likely that the court would have provided a more detailed analysis, thereby obviating the issue for purposes of appeal. *See United States v. Simmons*, 587 F.3d 348, 357 (6th Cir. 2009). And, even if the court had responded to an objection by stating that it "had already addressed the argument in a satisfactory manner," *id.*, there is no reasonable probability that it would have resulted in a remand after appeal, given that the Sixth Circuit found that the record in this case "amply supports [the court's] conservative estimate." *Bradley*, 897 F.3d at 785.

According to Bradley, if counsel had objected, "the Court would have been required to make its own findings" and there is a "reasonable probability" that the court would have discounted the probation officers' drug calculations and arrived at more favorable calculations to Bradley. (Doc. No. 9 at PageID# 84-85). However, there is no reasonable probability that an objection would have resulted in a lower overall sentence. For one thing, a reduction of the base offense level from 36 to 34 would not have changed the actual sentence imposed because it would not have changed the total offense level; it would have only reduced the offense level from 45 to 43, which would still produce a guideline range of life imprisonment before factoring in the statutory maximums. Indeed, as the court previously expressed, "a few points one way or another on these various enhancements would not make any difference in my sentence." (Crim. Doc. No. 919 at PageID# 3436-37). In sum, there is no reasonable probability that, but for Mr. Mackler's failure to object to the adequacy of the court's explanation, Bradley would have received a shorter sentence. Bradley cannot prevail on this ineffective assistance claim.

### 3. Failure to introduce evidence to dispute the application of the firearm enhancement

In Ground Three, Bradley alleges that Mr. Mackler provided ineffective assistance of counsel when he failed to introduce evidence to dispute an enhancement for firearms at sentencing. (Doc. No. 1 at PageID# 4).

Section 2D1.1 of the USSG provides for a two-level sentencing enhancement "[i]f a dangerous weapon (including a firearm) was possessed" in connection with a drug offense. United

States Sentencing Comm'n, Guidelines Manual § 2D1.1(b)(1). The comment to the guideline notes that "[t]he enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons." *Id.* § 2D1.1 cmt. 11A (2014). "The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." *Id.*

The application of this enhancement "involves a two-part-test." *United States v. Pryor*, 842 F.3d 441, 452 (6th Cir. 2016). For the enhancement to be applied, the government must establish "by a preponderance of the evidence that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense." *United States v. Climer*, 591 Fed. App'x 403, 412–13 (6th Cir. 2014) (quoting *United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012)). The first step can be satisfied through proof that a co-conspirator actually or constructively possessed the weapon during the commission of the offense, so long as either (1) the defendant "aided, abetted, counseled, commanded, induced, procured or willfully caused" the co-conspirator's actions, or (2) the co-conspirator's actions were within the scope of the jointly undertaken criminal activity, were in furtherance of the criminal activity, and were reasonably foreseeable. *See id.*; U.S.S.G. § 1B1.3 (defining relevant conduct); *United States v. Howard*, 570 Fed. App'x 478, 481 (6th Cir. 2014) (defendant has constructive possession of a firearm when he has "ownership, or dominion or control over the item itself, or dominion over the premises where the item is located."). If the government satisfies its burden, the defendant must then demonstrate that it was clearly improbable that the weapon was "connected to the offense." *Climer*, 591 Fed. App'x at 413.

During sentencing, Mr. Mackler argued that the two-level firearm enhancement was not warranted because there was no evidence that Bradley "did anything inside of the house" and "[t]here's no proof of actual or constructive possession." (Crim. Doc. No. 919 at PageID# 3402).[5]

---

[5] Bradley makes these same arguments now. (Doc. No. 9 at PageID# 87).

The government argued that, because the interceptions revealed that Bradley was storing both drugs and money at his parents' residence, there was proof that Bradley actively or constructively possessed a dangerous weapon during the commission of the offense, which shifted the burden back to Bradley to establish that it was clearly improbable that the dangerous weapon was connected to the offense. The court took this matter under advisement (*Id.* at PageID# 3404) and issued a ruling later (Crim. Doc. No. 1007-1 at PageID# 3915-16) (Sealed).

In ruling, the court applied the two-level enhancement based, in part, on the unrebutted testimony of Officer DeRiggi that Bradley's father had told agents that every gun found in the house belonged to Bradley with the exception of the rusty, old shotgun. The court found that the defendant had failed to prove that it was clearly improbable that these weapons were not connected to the drug conspiracy. (Crim. Doc. No. 1007-1 at PageID# at 3916) (Sealed).

Bradley now alleges that Mr. Mackler should have called his father, David Bradley, to testify at sentencing and that, if he had done so, his father would have testified that (1) he never told agents that the guns belonged to his son, and (2) "[o]ur house was open to friends, family, and our neighbors for block parties and social events." (Doc. No. 1 at PageID# 15). Bradley has submitted his father's sworn affidavit in which he states that he never told Officer DeRiggi that the guns belonged to his son. (Doc. No. 1, Exh. A). Bradley also alleges that, during his sentencing hearing, Mr. Mackler had a copy of David Bradley's affidavit and even discussed the affidavit with David Bradley. (Doc. No. 1 at PageID# 9). Bradley alleges that he instructed Mr. Mackler to call his father to testify but that Mr. Mackler "told Bradley that he could not call his father because he had not prepared him to testify and that presenting questions to a witness who had not been prepared to testify would just make matter[s] worse and it could cause more damage than good." (Doc. No. 9 at PageID# 86-87). Bradley believes that his father's testimony, coupled with the government's lack of evidence that the guns belonged to the defendant (Doc. No. 9 at PageID # 87) would have led the court not to apply the firearm enhancement.

The decision of "whether to call a witness" and "how to conduct a witness's testimony are classic questions of trial strategy." *Rayborn v. United States*, 489 Fed. App'x 871, 878 (6th Cir. 2012); *see also Strickland*, 466 U.S. at 672–73, 698 (holding decision not to call character witnesses at sentencing was a reasonable strategic decision); *Clark v. Mitchell*, 425 F.3d 270, 286 n.6 (6th Cir.2005) (holding decision not to call witnesses to testify at sentencing to prevent cross-examination was strategic). It is the responsibility of counsel to make strategic decisions at trial and sentencing. *See Strickland*, 466 U.S. at 672–73. When a movant challenges counsel's performance, the movant's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo v. Moore*, 562 U.S. 115, 120 (2011) (quoting *Strickland*, 466 U.S. at 687). "Strategic decisions made after a thorough investigation of the relevant law and facts are . . . 'virtually unchallengeable.'" *Rayborn*, 489 Fed. App'x at 878 (quoting *Strickland*, 466 U.S. at 690).

David Bradley was present at the sentencing hearing and spoke directly to the court from the gallery at the conclusion of the hearing. (Crim. Doc. No. 919 at PageID# 3368, 3438). Mr. Mackler consulted extensively with Bradley throughout the hearing, including during the cross-examination of Officer DeRiggi. (*Id*. at PageID# 3311). At no point did Bradley inform the court that he disagreed with Mr. Mackler's decision not to call his father to testify.

Like the decision not to dispute the adequacy of the explanation provided by the court when it found that the quantity of drugs yielded a base offense level of 36, the decision not to call David Bradley was an informed strategic choice by Mr. Mackler. According to David Bradley's affidavit, he would have denied having told the agents that the guns belonged to his son and would have suggested that the guns could have been placed in his house by friends or neighbors when they came over for parties. Such testimony would have been unlikely to change the court's factual finding because the suggestion that a neighbor came to the Bradley home for a party and hid multiple, loaded firearms throughout the house is implausible on its face. Given the evidence

showing Bradley's connection to his parents' home, and his use of that home to store pills and money, it was plausible for the court to conclude that the firearms belonged to Bradley. Bradley has never argued and does not argue now that it was clearly improbable that the guns were connected to the offense.

In addition, Bradley's father's testimony could have revealed the advantages that Bradley had throughout his life (thus reiterating that his criminal conduct was motivated by greed rather than necessity) and the damage caused to Bradley's family and community by his criminal conduct. Cross-examination could have exposed Bradley's father to uncomfortable questions about what he knew of his son's conduct. After weighing these pros and cons, it would have been entirely reasonable for Mr. Mackler to choose not to call David Bradley as a witness.

Even if Mr. Mackler had performed deficiently by failing to call David Bradley as a witness, Bradley cannot show prejudice because the elimination of the two-level enhancement would not have changed his total offense level. And, even if the total offense level had been lower, the court would have imposed the same sentence regardless, as it noted on the record at the time. In sentencing the defendant, the court called this "a very serious crime" and noted that the defendant had "a very serious role." (Crim. Doc. No. 919 at PageID# 3918). Even so, the court varied from the guideline sentence because the court found that the guideline sentence was not supported by empirical knowledge or research and could not be justified. (*Id*. at PageID# 3921). In doing so, the court stated:

> . . . I've granted a very, very significant variance, and a few points one way or another on these various enhancements would not make any difference in my sentence.
> I've been very generous and this is a very generous variance and probably would make absolutely no difference in my sentence.

(*Id*. at PageID# 3927).

An attorney's "failure to call favorable witnesses can amount to ineffective assistance where it results in prejudice to the defense." *Pillette v. Berghuis*, 408 Fed. App'x 873, 884 (6th Cir.

2010). But "[a] defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant." *Millender v. Adams*, 376 F.3d 520, 527 (6th Cir. 2004) (quotation marks and citation omitted).

Bradley argues that he is prejudiced by the enhancement because it affects his classification and custody level as well as his ability to participate in the Residential Drug Treatment Program, the successful completion of which would reduce his sentence by one year. (Doc. No. 9 at PageID# 7). However, the court lacks any jurisdiction to require the Bureau of Prisons (BOP) to permit the movant to participate in any particular BOP program and has no authority to remove the firearm enhancement for that purpose. *See United States v. Callan*, 96 Fed. App'x 299, 301 (6th Cir. 2004); *Bryant v. United States*, No. 2:06-CV-210, 2007 WL 4376099, at *8 (E.D. Tenn. Dec. 13, 2007) (where petitioner sought removal of firearm enhancement because it affected her classification within the BOP and her eligibility for certain BOP programs, finding the court lacks any jurisdiction to require the BOP to permit the petitioner to participate in any particular BOP program and has no authority to remove the gun enhancement for that purpose). If the BOP determines that Bradley has a treatable substance abuse condition, he likely will be provided treatment regardless of the firearm enhancement. The relief sought by Bradley, *i.e.*, that he attend the Residential Drug Treatment Program, is available to him regardless of the court's application of the firearm enhancement. The firearm enhancement affects his ability to qualify for the incentive of a reduction of his period of custody for successfully completing the program, not his ability to receive treatment. *See Brooks v. United States*, Nos 2:08-CR-102(32), 2:11-CV-252, 2011 WL 6002932, at *1 n.1 (E.D. Tenn. Nov. 30, 2011) (noting that, "[i]n reality, it may be the sentence reduction for successfully completing the program which Brooks actually seeks.").

The court therefore concludes that Bradley is not entitled to relief based on his claim that defense counsel provided ineffective assistance at trial as a result of his failure to call his father as a witness to dispute the application of the firearm enhancement. Even assuming that Mr. Mackler

was ineffective in failing to call David Bradley, Bradley has not shown that the testimony of his father would have resulted in a reasonable probability that, had counsel called the witness, Bradley's sentencing would have turned out differently. This claim will be dismissed.

**B.     Guilty Plea**

Bradley next alleges that counsel did not adequately inform Bradley of the charges against him; therefore, Bradley's plea was not knowing and voluntary and he should be allowed to withdraw his guilty plea. (Doc. No. 9 at PageID# 91). Specifically, he claims, as he did in Ground One, that he did not realize that he was being charged with *knowingly* conspiring with others. (Doc. No. 1 at PageID# 5).[6]

*Strickland's* two-part test applies to a claim that counsel was ineffective at the plea stage of the criminal proceedings. *Rodriguez-Penton v. United States*, 905 F.3d 481, 486 (6th Cir. 2018). "Where . . . a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)). A petitioner demonstrates prejudice in the plea context by establishing "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial," *id.*

---

[6] To the extent that Bradley raises a freestanding claim that his plea was unknowing and involuntary, such claim is not properly before the court. Bradley did not raise this claim on direct appeal. Claims that could have been raised on direct appeal, but were not, are procedurally defaulted and will not be entertained by motion under § 2255 unless the movant shows cause and actual prejudice to excuse his failure to raise the claims previously or that he is actually innocent of the crime. *See Bousley v. United States*, 523 U.S. 614, 621-22 (1998) ("[E]ven the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review."); *Swain v. United States*, 155 Fed. App'x 827, 830 (6th Cir. 2005). Bradley must therefore "show cause and prejudice, or actual innocence" to excuse the default. *See Swain*, 155 Fed. App'x at 830 (citing *Bousley*, 523 U.S. at 622-23).

Bradley cannot show cause or prejudice. And, given the overwhelming evidence of Bradley's participation in, and leadership of, the drug conspiracy, he cannot show actual innocence. Therefore, any freestanding claim that his plea was unknowing or involuntary will be dismissed.

at 59, or that, had he been properly advised by counsel during the plea negotiations, he "would have bargained for a more favorable plea," *Rodriguez-Penton*, 905 F.3d at 488.

The record in the movant's criminal case undermines his allegation that he did not understand the essential elements of the charges against him. After the court explained the charges to Bradley, he confirmed, under oath, that he "underst[ood] the nature, the meaning, and the cause of the charge against [him]," and that Mr. Mackler had discussed with him both "what the government would have to prove for [him] to be found guilty of Count One and Two," and "any possible defenses that [he] might have." (Crim. Doc. No. 1027 at PageID# 4018). Bradley stated that he had told Mr. Mackler everything he knew about the facts on which the charges were based. (*Id*. at 4018). Bradley confirmed that his mind was clear, he knew what he was doing, he was not having any trouble understanding the court, and that his plea of guilty was voluntary. (*Id*. at 4022). The court advised him of the criminal trial rights he was giving up and the potential penalties for the crimes to which he was pleading guilty, and he stated that he understood. (*Id*. at 4020-22). Bradley told the court that he was satisfied with Mr. Mackler. (*Id*. at 4018). Bradley's sworn testimony is a "formidable barrier" to § 2255 relief, which he has not overcome. *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *see also Craig v. United States*, Nos. 2:08-CV-56, 2:04-CR-78, 2011 WL 864359, at *6 (E.D. Tenn. Mar. 10, 2011) (holding that "the transcript of the change of plea hearing confirm[ed] the knowing and voluntary nature of the waiver"), *aff'd*, 513 Fed. App'x 487 (6th Cir. 2013).

Bradley attempts to address his prior sworn testimony by arguing that he pleaded guilty only because he thought was being accused of *unknowingly* conspiring to knowingly distribute drugs. (Doc. No. 9 at PageID# 91). According to Bradley, had he known that he was being accused of knowingly conspiring to knowingly distribute drugs, he would have opted for a trial. (*Id*.) As the court explained above, the conspiracy count properly set forth the essential elements of the offense charged and counsel was not deficient for failing to challenge the indictment. Moreover,

Bradley has not shown that his attorney's advice was outside the range of competence demanded of attorneys in criminal cases. There was overwhelming evidence in this case showing that Bradley was regularly directing co-conspirators' actions of collecting pills, storing pills, packaging pills, driving pills to other states for distribution, and collecting money in sales. Had Bradley elected to proceed to trial with the defense that he did not knowingly conspire with others, there is no reasonable probability that he would have been acquitted.

Furthermore, it smacks of incredulity for Bradley to now suggest that he would have insisted on going to trial when he has repeatedly insisted that his acceptance of responsibility is full, sincere, and consistently maintained since the day of his arrest. When Bradley allocuted at the sentencing hearing, he told the court that he accepted full responsibility for his actions and stated, "I want my family, the community and the Court to see the sincerity in my apology by the way I am taking full responsibility for the bad choices I made." (Crim. Doc. No. 919 at PageID# 3362-68). He acknowledged that he "was already blessed to have a career as a licensed CAT scan technician at Detroit's premier trauma center," where he "made enough money to provide for my family." (*Id.* at PageID# 3363). He admitted, however, that "[i]t was nothing but pure stupidity and greed that caused me to make that uneducated choice to start buying and reselling prescription pills when the proposition was presented to me. My only goal was to make some quick and easy money to buy things that I now realize I really didn't need. . . . I am ashamed and embarrassed but also convicted within my own heart because I was selfish and ungrateful." (*Id.* at PageID# 3363-64). He even asked Judge Campbell why the proceedings were "taking so long since I admitted my guilt the day I was picked up." (Crim. Doc. No. 397 at Page ID# 1194-95).

Finally, the sentence Bradley received cuts against his bald assertion that, but for counsel's alleged deficient performance, he would have insisted on going to trial. *See Moore v. United States*, 676 Fed. App'x 383, 386 (6th Cir. 2017) (holding that, in determining whether a "rational"

criminal defendant would have insisted on going to trial, a court must consider the "disadvantages" he would have faced had he not entered a plea of guilty).

On this record, Petitioner's claim that his plea was involuntary and unknowing due to attorney ineffectiveness is without merit. The claim therefore will be denied.

### C. *Holguin-Hernandez* **claim**

In his fifth and final claim, Bradley alleges that he may be entitled to relief on the basis of the Supreme Court's decision in *Holguin-Hernandez v. United States*, No. 18-7739, 589 U.S. ___ (2020). (Doc. No. 1 at PageID# 13-14). *Holguin-Hernandez,* which had not yet been decided at the time Bradley filed his § 2255 motion, presented the question of whether a criminal defendant who argues in the district court for a lower sentence must formally object after pronouncement of his sentence to preserve a claim for appeal that his sentence is substantively unreasonable. Bradley argues that Mr. Mackler's failure to raise a formal objection to the method the court used to determine Bradley's sentence and failure to object to the sentence imposed could be deemed ineffective, depending on the Court's decision in *Holguin-Hernandez.*

On direct appeal, Bradley claimed that his seventeen-year sentence was too long and therefore substantively unreasonable. *United States v. Bradley*, No. 17-5725, 897 F.3d 779, 786 (6th Cir. 2018). Bradley pointed to the twelve-year sentence of co-defendant Buchanan to support his claim, arguing that the five-year difference between his sentence and Buchanan's sentence was the result of the trial court's "differential (and unfair) weighing of the same discretionary factor— the purported unfairness of the intra-district sentence disparities wrought by the government's course correction on drug-weight calculation."[7] *Id*. In reviewing this claim, the Sixth Circuit first noted that Bradley's challenge represented an extremely tall order, given that his sentence was "less than half of the recommended range." *Id*. The Court then considered the role Buchanan and

---

[7] The drug quantity differential was only part of the sentencing equation for Buchanan. He had pled guilty under a plea agreement and had cooperated early and for some two years. The court gave him credit for that cooperation, even though it did not net him a § 5K motion from the government.

Bradley each played in the conspiracy and concluded that "[t]he five-year difference in their sentences turns on differences in their conduct." *Id.*

In its analysis, the Sixth Circuit did not expressly state the standard of review for Bradley's substantive-reasonableness challenge. However, the Sixth Circuit reviews the substantive reasonableness of all sentences under an abuse-of-discretion standard.[8] *United States v. Libbey-Tipton*, 983 F.3d 694, 705 (6th Cir. 2020) (citing *Gall v. United States*, 552 U.S. 38, 41 (2007)). A review of the Sixth Circuit's analysis reveals that the Court reviewed the substantive reasonableness of Bradley's sentence under the abuse-of-discretion standard, rather than the plain-error standard.[9]

On February 26, 2020, the United States Supreme Court rendered its decision in *Holguin-Hernandez.* The Court held that the defendant's district court argument for a specific sentence (namely, nothing or less than twelve months) preserved his claim on appeal that the twelve-month sentence was unreasonably long. The decision, then, affords Bradley no relief as there is nothing else that Mr. Mackler should have done to preserve Bradley's substantive-reasonableness claim on appeal. And the Sixth Circuit already has reviewed Bradley's substantive-reasonableness claim under the abuse-of-discretion standard, rather than the plain-error standard. This claim therefore will be dismissed.

---

[8] It is worth noting that, when Bradley's case was before the Sixth Circuit on direct appeal, the government expressly stated that his substantive-reasonableness challenge should be reviewed for abuse of discretion, not plain error. *United States v. Bradley*, Case. Doc. No. 17-5725 (Doc. No. 33 at 43).

[9] Bradley insists that the Sixth Circuit reviewed his substantive-reasonableness claim for plain error. (Doc. No. 1 at PageID #14, Doc. No. 9 at PageID# 92-93). However, the language of the Court's opinion cited by Bradley comes from the Court's analysis of his procedural-reasonableness claim—not his substantive-reasonableness claim. The Sixth Circuit reviewed Bradley's procedural-reasonableness claim for plain error. *Bradley*, 897 F.3d 779, 784-85.

**IV.    Conclusion**

For these reasons, the movant is not entitled to an evidentiary hearing, and his claims fail. Accordingly, the movant's motion under 28 U.S.C. § 2255 (Doc. No. 1) will be denied, and this action will be dismissed.

**V.    Certificate of Appealability**

Rule 11(a) of the Rules Governing Section 2255 Cases requires that a district court "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue only if the "applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). The court finds that the movant has not satisfied this standard and will therefore deny a certificate of appealability as to each claim raised in Bradley's § 2255 motion.

An appropriate order will enter.

_____
Aleta A. Trauger
United States District Judge